2012-10-19 Mr. Monroe. Good morning. May it please the Court, I would like to address three issues this morning provided there's time. I'd like to start first with enablement, followed by induced infringement, and then if time documents equivalent. I would like to start with enablement because I think it highlights the need for appellate review here. The district court did not consider each of the kinds of issues that were brought up in this report. The district court did not consider each of the kinds of issues that were brought up in this report. The district court did not consider each of the kinds of issues that were brought up in this report. Any claims separately in its enablement analysis, but rather took a wholesale approach to say the claims were not enabled. And this was error because the, if one looks at the claims individually, you will see in particular that the dependent claims that are directed to a preferred embodiment but there's no contention that Susannia A and B's preferred embodiment is enabled by the specification. Enablement is a question of law, right? That is correct, Your Honor. Why is that so when the description is a question of fact? That's a good question, Your Honor. Unfortunately, we did not have that issue in this case. And I think for this case it was well… I thought I'd get the real answer one day. Someday. Here the court looked at enablement as a question of law, but didn't actually look at all of the claims individually. And that's one of our main concerns regarding the court's decision. The second concern is the district court essentially shifted the burden. Are you saying so we should let the specific, the dependent claims live even though we strike out the first claim? We believe, we contend that all the claims are enabled, Your Honor. But in particular, if you look at the dependent claims, it highlights his failure to analyze the issues correctly. In other words, there was no clearly convincing evidence to invalidate those claims that are enabled. That is correct, Your Honor. And as to the broad claims, the district court, there was no dispute. The APTEC conceded, its experts conceded that all multi-particulates except for the infringing granulations were enabling. So they conceded that from a multi-particulate standpoint, everything was enabled except for the infringing granulations. Cutting to infringement, don't you need to show that the ANBA tracks your product and indicates inducement of what is in the claims? And when I look at the ANDA, I find all there is is a discussion of capsule versus tablet and fed versus unfed rather than suggestion to do what the claims require. Your Honor, what's important is to look at the label. And at the very beginning of the label, there is in bold capitalized letters a warning that says, please pay attention, read about the pharmacokinetics of this drug with food, which has an unexpected scenario. Wait a minute. Isn't it correct that the FDA didn't permit your label to promote this as reducing CMAPs when taken with food? No, Your Honor. The FDA did not actually find that. That's been a construction of something that didn't actually happen. There was no request to add a statement to say take it with food. Rather, what was presented to the FDA was changing the label to note the differences between taking it with and without food. The FDA approved that. And the FDA, even in considering that issue, specifically noted that patients will be titrated to take the drug with food based on the information that's going to be in the label. So you're saying that the FDA did not disallow or did not restrain ACORDA from promoting the use of the drug with food? That issue wasn't presented before the FDA and it did not decide that issue. ACORDA does not promote it outside of what's specifically in the label. It does acknowledge that the label does teach both with and without food. If you want the reduction in CMAPs, the reduction in adverse events, the label tells you to take it with food, the capsules with food, not the tablets. But the label doesn't say how to reduce somnolence or reduce the peak plasma concentration, does it? The label does tell you to reduce explicitly, to reduce the CMAPs in the blood, that what you would do is take the capsule with food. Where, on what page of the appendix? I have it on my, on the ACORDA label. If you look at A2751, it states that in contrast when the... Yes, Your Honor. I'll move to that. In the APTEC label, it states at A2812, in contrast, when the capsules are administered with food... Wait a minute, hold on, just wait a minute. 2812? Yes, Your Honor, at the top of the page. Alright. When two capsules are administered with food, the mean maximal plasma concentration is decreased by 20%. That's a scientific statement. That it, the label tells you at the very beginning that you need to take into account when you're prescribing this medication, and it specifically tells the prescriber that you need to be familiar with the complex effects of food. On tizanidine pharmacokinetics, it directs you to that statement in the pharmacokinetic section. It also directs you to the dosage and administration section, in which it again tells you, Your Honor, at A2827, that food has complex effects on tizanidine pharmacokinetics, which differ with the different formulations. These differences may result in clinically significant differences when, one, the first item, switching administration of the capsule between the fed or fast stage, and it goes on to say, these changes may result in increased adverse events, and it goes on to say, the prescriber should be thoroughly familiar with the changes in pharmacokinetics. And then, if you turn back to the information for patients section, at A2820, this label goes one step further and says, patients should be advised of the change in the absorption profile of tizanidine if taken with food, and the potential changes in efficacy and adverse effect profiles that may result. So this label, unlike your typical label, specifically at the very beginning warns the prescriber, there is this food effect, then tells the prescriber where to go in the label to learn about that food effect and what will happen when you take the capsule with food, and then it tells the prescriber to tell the patient about this. And in the FDA's consideration of this issue, it specifically considered, for example, at A3560, that patients will be titrated to take the capsule in the fed state, and in fact, that's how Apotex itself, when it first learned about this product, at A3061, was an email from the main formulator for Apotex, and when he looked at the label, he said the labeling states that Tmax is longer and Cmax lower with food, when tablets are taken with food. He looked at that specific portion of the label, just as we are saying that physicians and all healthcare professionals will do. And then he, quote, bang on the first try, developed their product, which goes, again, back towards our enablement issue in the sense that the only thing they've contested with respect to enablement on multi-particulate is the infringing granulation, and their own formulator said he developed theirs bang on the first try. It was very easy to obtain a granulation as a multi-particulate, and therefore, we would argue from the enablement standpoint, there is no clear and convincing evidence of undue experimentation when one develops a product. It was a counter-claim, right? Not just a defense. That's correct. So on the inducement issue, I'll finish on enablement. Our main point on enablement is the broad claims, nothing was contested on multi-particulate except the granulation, which they got bang on the first try, which is evidence that this is not that difficult and doesn't require undue experimentation. The other aspect of their enablement argument had to do with the type and timing of food, and they had an expert. The only evidence they presented was an expert who said it gets a little dicey when you get outside of the preferred embodiment of when to take the drug with what type of food. He conceded that it was enabled for taking the drug in the preferred embodiment that was in the patent, but then said as you get beyond that, it's a little dicey. That's not clear and convincing evidence of non-enablement. And on the other side, a quarters expert who was the only expert in pharmacodynamics, in addition to pharmacokinetics, he explained that as you get further away from the preferred embodiment, you'll get a less effect. As you take less food and further away from the time of eating, you'll get less effect, but you still get an effect. And the whole purpose of this drug, the capsules, and the reason they've competed so well with the tablets in the marketplace, even though they cost more, is patients want to take them with food to reduce their thalamus. They need to take the drug, and they want to take this particular version of the drug with food to reduce their thalamus. That's what Abbatex recognized in the label, and that's what they have tried to commercialize and benefit from. With respect to the inducement, we really do believe, Your Honor, that this case is a follow-on to the AstraZeneca case in a sense, in that it really does, if you look at the label, provide even clearer instruction that you're supposed to be aware of the pharmacokinetics and prescribe accordingly, as the FDA recognized and as Abbatex recognized when it first read the label. As far as the doctrine of equivalence, our dispute there, Your Honor, is that the district court seemed compelled to apply the functional wave result test, which we agree can be a good test, but not in all situations. In this particular case, we have a pharmaceutical compound, Tizanidine, which has these unexpected properties where it behaves one way when it's in an immediate-release multi-particulate form, and it behaves in another way when it is in an immediate-release tablet form. And that was an unexpected finding. Prior to that discovery, one would not have assumed that, but once you had arms with the patent and you saw that you had this unexpected discovery, switching out a granulation for a multi-particulate is a interchangeable— it's really what the interchangeability test was designed for, where it was something so easy that you could switch one out for the other and get the same result. So we believe the district court should not have been limiting the issue to functional wave results, but rather should have gone beyond that to the insubstantial differences test. And I'll save the rest of my time for Abbatex, Your Honor. We will save it. Mr. Nelson. May it please the Court. I'd like to spend our time together today focusing on the induced infringement analysis and non-enablement, and I'll also address the doctor equivalent issue. And I'd like to focus on how the district court applied the correct legal analysis here to its factual findings and its credibility determination, finding no infringement, no induced infringement, and no enablement of the claims here. Your Honors, the first thing we have to focus on when we talk about inducement is the touchstone inducement. What the case law tells us is a touchstone inducement, and that's encouragement. And that's what Mr. Monroe didn't address at all, is whether there's encouragement in the label to practice the claim methods, administering with food to reduce CMAX and to reduce SOMA. But from the label, could one conclude that one should do what the claims require? From the label, no, because there is no encouragement. And that's what the testimony was, and that's what the district court found. Because the district court found, the district court looked at a lot of things. The district court looked at the entirety of this label, and that's the key. A court wants to pick out little spots of the label and piece them together. The district court looked at the entirety. And what the district court found is there's teachings in this label, very important ones, that go against, that warn against practicing the claim methods here. Dr. Rezac, Appetect's medical officer, said something very poignant during trial. He said doctors practice evidence-based medicine. They want to see some sort of encouragement in the label if they're going to prescribe the drug a specific way because they want to know the benefits. Wasn't the evidence in the label, though? No, the evidence is not in the label, and this is why, Your Honor. The label, first of all, is missing three very important words when it talks about food. It doesn't say take with food. It just says take as needed or take when treated or relieving spasticity as needed. That's not an instruction that doctors take with food. In addition, the label says it doesn't say anything about reducing somnolence. And this goes to Your Honor's point, Judge Crow's point, about what did the FDA find. This is what the FDA actually found. The words from the FDA, A3530, the sponsor believes that less variation in the PK profile in the presence and absence of food for the capsules will have a clinical benefit in providing a more consistent pharmacological and safety profile. This has not been established in the present NDA. That is a clear rejection of the FDA of their position that taking this product with food reduces somnolence and reduces CMAX. They admitted they never did the test that shows a reduction in somnolence, and the FDA in fact said that the CMAX data was unreliable. Would you say that based on the labeling, if someone wished to increase somnolence, some people don't sleep so well at night, that based on the labeling one would have the information to do that? Absolutely, and that's what Judge Brown talked about, and that's what Dr. Rezek talked about, and that's one of the teachings in this label is if you want immediate relief from your spasticity, take this without food. And if we look at some of the labeling portions that my colleague talked about, let's look at those a little bit more in depth because Mr. Monroe cut off some of those statements. If we look at 28, where he talks about the four important portions of the label, where it talks about the switching, it in fact says there that when you're dosing this without food, you can see a delay in onset of treatment of the spasticity, and that's key for a doctor practicing evidence-based medicine. You're saying with food? With food, yes, with food. Isn't that sort of a basic, not that we should be going beyond the record, but prescriptions often say take it on an empty stomach because you get faster absorption. Yes, and that's true, and that's true in this case. And the doctor, looking at the statements in the label here, concerned about that delay in efficacy when taken with food, is not going to be encouraged to tell his patient. He would have to look his patient in the eye, and knowing that there could be a three-hour delay in treating their spasticity, a painful, debilitating disease, he would have to look his patient in the eye and say, you may have to take this, if you take this with food, first of all, if you take it with a high-fat meal, because that's all they've enabled, stop what you're doing when you have spasticity. Take it with a high-fat meal, and then you may have to wait three hours to have your spasticity relieved. That's not an encouragement. Why shouldn't we reverse on enablement? On enablement, the district court looked at the full scope of the claims, and Mr. Monroe talked about how, first of all, Apotex conceded that the only issue there was Apotex's granulation. That's not true. The full scope of the claims is that the district court construed them for any granulation. Apotex's granulation uses a pH-dependent polymer, PVAP, to control release of its drug. The district court expressed that the tizanidine on beads embodiment was the only embodiment properly disclosed in the 557 patent, right? If I could correct, Your Honor, it's the only embodiment that they have examples for. The district court referenced Dr. Williams, their expert. He says it can make granulations. One could make granulations from a tizanidine, but it doesn't say how to make granulations without PVAP in order to get the claimed reduction in Cmax and solids, and that's the key. Apotex didn't concede that all granulations are a question. Apotex didn't concede that only its granulation is at issue here. All granulations are not enabled. It's not enabled across the full scope. Furthermore... But the test is clear and convincing evidence. Now, if Apotex had done tests and said, this won't work, that won't work, this won't work, that might be clear and convincing evidence of non-enablement. We don't have that, do we? It's clear and convincing evidence of showing undue experimentation. Apotex didn't have to go out and perform the undue experimentation and say, aha, it failed. That's not the standard here. The standard is not when you get to the end of the testing, did you succeed? The standard is whether the testing itself is undue. And that's why if we look at what Mr. Munro wants to talk about, the dependent claims, those dependent claims only fix one of four very broad variables, not just the multi-particulate that go from the tizanidine on beads all the way to any granulation that could possibly need made. What's undue about carrying out the same tests that are in this specification? What we'd have to do, Your Honor, is we'd have to perform clinical studies, which are very expensive, time-consuming, they could take up to a month. We'd have to cross these people over. We'd have to do fed and unfed, and we'd have to do it with... But that's inherent in this subject matter. That is inherent. It's not necessarily undue in the science. That's true. But what is undue is the amount of experimentation, because you'd have to do it from any kind of granulation all the way through to tizanidine on beads. Then you'd have to do it with every type of food, from a small snack all the way to this full, fat meal, and anywhere in this three-hour window. And that's where it's undue, because you'd have to experiment with each and every one of these down the road. So again, if we just hold the tizanidine on beads, like they do in dependent claims 7 through 9, you hold the tizanidine on beads, you still have all these other variables to take into account. That's where you need undue experimentation. The amount of food, the timing of food, the type of food. But the court invalidated all of them. The court invalidated all of them because Dr. Meyer testified individually about each of the dependent claims. So it's all there in the record. And that's another thing, too. Dr. Meyer actually did provide evidence, substantial evidence, of undue experimentation. He talked about... Counsel talked about, oh, he just said, it's a little dicey when you give the unpreferred vitamins. No, no. What he said was, if there's not enough food in the stomach, if you take a small meal, that food could be emptied out. If you take the drug an hour later, which is within the scope of the claim, that food's going to be gone. It's not going to help you reduce stomach. There's a specific example there. He also talked about individuals who, when they take it, they've reached their C-max. Any food after that, not going to be helpful. He further talked about 33 out of 89 people in the preferred embodiment. That's to say any amount of beads with a high-fat meal at the same time didn't achieve the claimed reduction in C-max. When you have that kind of variability in the preferred embodiment, that tells you undue experimentation can be needed to practice the full scope of the claim. He also provided some other examples, but the one thing I want to focus on is what it accorded you to respond to that evidence. Now, Mr. Monroe talked about how they were tasked with the burden of proof on this issue. Not true at all. As I've shown you, apothecary made a substantial showing of clear and convincing evidence. They had the opportunity to respond, and if we look at the response, Dr. Thrower, their medical expert, when asked on the stand, if you took a snack of carrots, you wouldn't expect this to work, would you? He said, again, I would not expect it to work. That's telling you, if a medical doctor, an expert in the area, wouldn't expect it to work, you need undue experimentation. Whose witness is that? That's their medical expert, Dr. Thrower. So that tells you, they had the opportunity to respond. They were not tasked with showing doctrine of equivalence, by any means. To turn very quickly to the doctrine of equivalence issue, Mr. Monroe talked about how they were compelled to use a function-of-weight result test in this case. The court can read the opinion. There's no evidence that the district court made a court to show anything as far as doctrine of equivalence using a specific test. In fact, the evidence shows from the opinion, they were able to present this interchangeability argument. But what Dr. Williams, their expert, failed to do was consider the individual components of Apotex's product, the powdered granulation, and the individual component at issue in the dependent claim, the tizanidine on beets. He has no idea how those things work to reduce the amount of solids. So I don't know how he can say that they're interchangeable. He doesn't understand, he doesn't take into account the role that those two play, which is the generalized testimony that is prohibited by this court's precedent in showing doctrine of equivalence. What the district court did do is it credited Dr. DeRosa's analysis under the function-of-weight result. And crediting one expert's testimony over another expert's testimony is not forcing them to prove their case one way or the other. And the last issue I'd address on doctrine of equivalence, unless the court has any other questions, the last issue on doctrine of equivalence is Mr. Monroe talked about unexpected results not being the doctrine of equivalence analysis, that they had unexpected results and that shows doctrine of equivalence. Unexpected results is not part of the doctrine of equivalence analysis. In fact, it's not part of the claims. The claims just say reduction in samples. And they were unable to show that Apotex's powdered granulation, if it reduces CMAQ, it does so in substantially the same way. That's what the district court found. One last point I want to make before I sit down, unless the court has any other questions, back to the enablement issue. A court of fault to the district court for its finding in the direct infringement case that Apotex's label doesn't, I forget the words the court exactly uses, it doesn't credibly reflect Apotex's product. And they criticized the court for that, but they don't say how that finding, which by the way the court used to eventually show that Apotex directly infringes the patent, they don't say how that finding went ahead and infected the rest of the analysis. And in fact, it doesn't. As we talked about before, the district court looked at the entirety of the label and found no encouragement in the label in this case. In fact, the opposite is true. There's no encouragement to dose with food. It doesn't say its soundness is reduced. And in fact, it encourages that there may be a delay in treating staff differently. If there's any questions from the court. Thank you, Mr. Nelson. Mr. Monroe has a little more than three minutes. Thank you, Your Honor. Just a few points. With respect to induced infringement, the argument that Apotex makes is that the label has to go beyond what is in the Grokster test and the AstraZeneca test. Rather than instruct how to engage in infringement, which was the language of the Supreme Court's decision, you must instruct that you must engage in infringement. There has to be an affirmative. You must do this. That's not the test. He didn't quite say must. He said encouraged. Encouraged. But I think encouraged is the word they're using for must. That's our position, Your Honor. And that was the way the district court looked at the case law that he thought was somewhat unsettled and tried to resolve that issue. The comments about trying to piece together the label, this isn't a puzzle like the district court discussed. This is actually a label approved by the FDA, directed to doctors. They were expected to read it, read the parts of it, especially when there's a warning at the very beginning telling them to look at these portions of the label, understand what they're doing, and prescribe it accordingly. Apotex also cited Dr. Rezac. He was not cited by the court. His testimony was not relied upon by the court in any way. With respect to the question that Your Honor asked about if you wanted to increase, then you would take it with food, the response was yes, based on what was on the label. That's because reading the label, one knows to increase and take the tablet with food. The flip side is one reads the label and knows to take the capsule with food to reduce CMAX. In other words, the label doesn't push either way. That is correct. It provides the physician with the option to treat a particular patient in a particular way. It doesn't sound like the intent to induce. It's an intent to induce the doctor in trying to deal with elevated CMAX levels and adverse events to tell them how to solve that problem. That's what Apotex discovered when it first read the label, as I quoted earlier, and that's what it decided to mimic. There was also a point in response to one of the arguments that Apotex made. In the court's decision, the court specifically found that some doctors, quote, got the message that when they read the label, they knew what it meant. That finding cuts against the holding that the label doesn't induce one to act a certain way. Finally, with respect to Dr. Thrower, it's in the transcript, but at A30098, what Dr. Thrower said was it might. He couldn't say definitively with a particular patient how much food would work at the far extremes and fringes. Dr. Thrower repeatedly testified that this isn't an issue of fringes. You're trying to prescribe the medication, and patients take it the way you ask them to. And Dr. Slotkin, the only pharmacokineticist, also a pharmacodynamic expert, said the same thing. And I think I would like to just one last comment direct as far as the credibility issues that have been suggested. With respect to Dr. Thrower, in the court's opinion, at A36 and 37 in the appendix, it's almost a whole page, beginning at half of one page onto the next page. There are discussions about Dr. Thrower that if one looks at the appendix site, he's actually referencing Dr. Slotkin and finding Dr. Thrower to be too expert in certain issues when it was really Dr. Slotkin. And we believe that impacted the court's analysis of Dr. Thrower's testimony, which was quite extensive. Thank you, Mr. Munro. I have to say the argument has certainly reduced the somnolence of the panel. If there wasn't. We'll take the bench to our advice. All rise. The honorable court is adjourned until tomorrow morning at 10 AM.